Edward SADLOWSKI et al., Plaintiffs,

v.

F. Ray MARSHALL, Secretary of Labor, Defendant.

Civ. A. No. 78–0250.

United States District Court, District of Columbia.

Feb. 8, 1979.

Joseph L. Rauh, Jr., Washington, D. C., for plaintiffs.

Robert M. Werdig, Jr., Asst. U. S. Atty., Washington, D. C., for defendant.

Michael H. Gottesman, Washington, D. C., for intervenor United Steelworkers of America.

## MEMORANDUM

GASCH, District Judge.

This is a complaint for declaratory and injunctive relief brought by plaintiffs, unsuccessful candidates in the February 8, 1977 election for International Officers of the United Steelworkers of America ("USWA"), against the Secretary of Labor for his alleged failure to make a full and complete investigation of the election. The complaint also alleges that the Secretary failed to carry out his duty as lawyer for the complaining union members and that his statement of reasons for not bringing suit demonstrates that the refusal to bring suit to overturn the election was arbitrary and capricious. For the reasons set forth below, the Court concludes that plaintiffs' claims are without merit and grants defendant's and defendant-intervenor's motions for summary judgment.

## BACKGROUND

The USWA is the second largest union in the United States with approximately 1.4 million members. It is divided into 25 districts, 22 in the United States and 3 in Canada, each headed by a District Director who is an International Officer. There are approximately 4,125 local unions, of which 827 are in Canada. The union holds quadrennial elections for International Officers. The actual election is conducted by the local unions acting as agents for the International. The election that is the subject of this lawsuit took place on February 8, 1977.

I. W. Abel, the incumbent International President, had announced that he would retire and would not be a candidate in the 1977 election. An officially endorsed slate of candidates for the five International Offices was announced at the August, 1976 USWA Convention. This slate was headed by Lloyd McBride as candidate for International President.

On September 13, 1976, plaintiff Edward Sadlowski, who served as District Director for the largest USWA district, announced his candidacy for International President. The other members of his slate, all plaintiffs in this action, were Ignacio (Nash) Rodriguez for International Secretary, Andy Kmec for International Treasurer, Marvin Weinstock for Vice President for Administration, and Oliver Montgomery for Vice President for Human Affairs.

In the fall of 1976, the International Union and plaintiff Sadlowski requested the Department of Labor ("DOL") to supervise the International election. This request was refused because Title IV of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA")[1] specifically provides for departmental supervision of a labor or-

ganization election only after an election has taken place and a departmental investigation based upon a member's complaint has established that violations of the LMRDA occurred during the election which may have affected the outcome. The Department, however, did agree to provide technical assistance with the conduct of the election.[2]

The election resulted in a victory for McBride, who defeated Sadlowski by 328,861 votes to 249,281, a margin of 79,580 votes. All other members of the McBride slate also were elected, but the victory margin was less for some offices than in the race for International President.[3] On February 18, 1977, Sadlowski filed a timely protest regarding the election with the International Tellers under article V, section 18 of the USWA Constitution. One week later he filed an additional protest, challenging various election procedures and omissions in the tabulation of votes.

The report of the International Tellers, dated April 28, 1977, acknowledged that a timely complaint had been filed and stated that in accord with the USWA Constitution, hearings would be conducted in twenty-five cities in the United States and Canada to hear protests involving election challenges in 367 locals. Sadlowski requested that his attorney be permitted to participate in these hearings, but this request was denied by the International Tellers on the ground that only USWA members could appear and participate in the hearings. After the hearings were held, the Tellers issued a report, denying Sadlowski's protests. The Sadlowski slate appealed this decision to the International Executive Board, which denied their appeal. McBride and his slate were installed in office on June 1, 1977.

---

1. 29 U.S.C. §§ 481–483 (1976).

2. The assistance included the formation of a task force to issue opinions and answer inquiries about the election, the assignment of compliance officers to each United States district to instruct local union tellers regarding standards of conduct for the election and to advise during the voting process, and the assignment of DOL personnel to total the results of local union election return sheets after they were received

by the International Tellers. Statement of Reasons, Exh. 2 to Defendant's Answer to Complaint, at 1–1A [hereinafter cited as Statement of Reason].

3. The closest race was that for International Vice President for Human Affairs, which was won by the McBride candidate by 52,176 votes. Statement of Reasons, at 3 n. 1.

Having exhausted internal union remedies, the members of the Sadlowski slate filed a complaint pursuant to section 402(a) of the LMRDA[4] with the DOL, alleging violations of the Act in the conduct of the election. This statute authorizes the Secretary of Labor to conduct an investigation and if this investigation discloses probable cause to believe that there have been violations that may have affected the outcome, the Secretary is authorized to institute suit against the Union to set aside the election and secure a new election conducted under the Secretary's supervision. 29 U.S.C. § 482(b). The LMRDA requires that suits by the Secretary to overturn the results of an election must be initiated no later than sixty days from the filing of a complaint. *Id.* Because of the scope of the complaint, the Secretary obtained a series of waivers from the USWA which extended the deadline for filing suit from August 16, 1977 to November 11, 1977.

Upon receipt of the Sadlowski complaint, the DOL initiated an investigation of the election. Two hundred and fifty investigators, including many who were specially detailed to this project from their normal assignments in other areas, were given special training and made available to work on the complaint. Each compliance officer was expected to work six days a week, ten hours a day. A special post office box was leased and all reports were mailed directly to the Washington office, which was open seven days a week.[5]

The allegations made by Sadlowski in his complaint with respect to the nomination process preceding the election were not investigated because no timely protests regarding the nomination process were made and the Secretary consequently was precluded from making them the basis of a complaint.[6] The investigation encompassed each of the 301 United States locals named in the complaint as well as an additional 411 local unions investigated on the initiative of the DOL.[7] These locals were selected for investigation on the basis of factors indicating some reason for suspicion, such as lack of election returns, lopsided results, or information gathered in the technical assistance program. Interviews were conducted with 5,422 witnesses.[8]

The complaint also alleged that election violations occurred in the Canadian local unions and districts. The DOL has no authority to investigate in Canada, but the Canadian Minister of Labor convened an industrial board of inquiry to investigate allegations regarding the conduct of the election in Canada. Mr. Roland Tremblay, a former provincial judge and president of the Arbitrators Conference in Quebec and of the Economic Arbitrators of Canada, was appointed to head the inquiry. On October 25, 1977, Commissioner Tremblay issued an Industrial Inquiry Commission Report and forwarded a copy to the DOL. In his statement of reasons the Secretary concluded that nothing in the Canadian report affected the conclusions reached by the United States investigation.

In order to assess the cumulative impact of the violations disclosed by the election, the Secretary utilized the following system for quantifying, in terms of votes potentially affected, the significance of each violation found. When members' valid votes had not been tallied, their votes were credited as cast. When members were denied the right to vote, their votes were credited to Sadlowski on the theory that, if given the opportunity, they might have voted for him. When a violation such as inadequate safeguards or lack of secrecy cast doubt upon the validity of the election as a whole, all votes cast were regarded as void. When

---

4. 29 U.S.C. § 482(a).

5. Statement of Reasons, at 5A.

6. *See Hodgson v. Local 6799, United Steelworkers of America,* 403 U.S. 333, 336, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971).

7. Statement of Reasons, at 6. The 712 locals investigated represented 351,000 members, or approximately 25% of the membership of the International Union. They accounted for approximately 30% of the votes cast in the United States. *Id.*

8. *Id.*

a violation such as expenditure of union funds or campaigning in the polling place tended to influence voters in favor of one candidate, all votes cast for that candidate that were subject to the improper influence were deducted from his total. When ineligible voters voted or eligible members voted more than once, their votes were deducted from McBride's total. When the violations were such that all votes cast were considered void and the local in addition failed to file an election return, the violations were deemed to have offsetting effects and no changes were made in vote totals.

On November 11, 1977, the Secretary set forth the results of the investigation. He found that there had been no widespread fraud or irregularities as alleged in the United States and that "on the whole, the election was conducted in accordance with the law and with the Union's constitution." [9] The Secretary also concluded that the isolated violations uncovered by the investigation were such as could be expected in any large election and that the violations could not have affected the outcome of the election in the United States.[10] As a result, the Secretary announced his decision not to sue to overturn the election and accompanied his announcement with an 83-page Statement of Reasons explaining the basis for his decision.

On February 14, 1978, plaintiffs instituted this lawsuit, seeking to compel the Secretary to bring suit to overturn the election. The USWA was granted leave to intervene as a party defendant on July 28, 1978. Presently before the Court are defendant's and defendant-intervenor's motions [11] for summary judgment.

## MERITS

The LMRDA regulates various aspects of labor-management relations and internal union affairs in an attempt to assure that "labor organizations . . . and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations . . . ." 29 U.S.C. § 401(a). The special function of Title IV of the Act is to ensure free and democratic union elections and the statute sets out an exclusive enforcement scheme to redress election abuses. *Wirtz v. Bottle Blowers Ass'n*, 389 U.S. 463, 470, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968); *Calhoon v. Harvey*, 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

The LMRDA precludes any private action by disappointed office seekers or other union members to contest the results of an election. Section 402 of Title IV sets up an exclusive method for protecting rights under the Act by permitting an individual member to file a complaint with the Secretary of Labor challenging the validity of any election. 29 U.S.C. § 482(a). The Secretary is required to investigate and if he finds probable cause to believe that Title IV has been violated, he may file suit against the union in the appropriate district court to set aside the election and secure a new election conducted under his supervision. *Id.* § 482(b).

The LMRDA does not expressly authorize or prohibit judicial review of the Secretary's decision not to bring suit challenging a union election. The Supreme Court, however, has held that limited judicial review of the Secretary's decision is available un-

9. *Id.*

10. *Id.* at 7.

11. Defendant-intervenor also has moved for summary judgment on the ground that the present action was not timely filed or, alternatively, that it is barred by laches. Plaintiffs waited ninety-five days after receiving the Secretary's Statement of Reasons to bring suit, and the USWA asserts that this delay is contrary to the statutory goal of expediting post-

election challenges. A recent decision of the United States District Court for the Northern District of Illinois held that a plaintiff was guilty of laches in failing to file suit to challenge the Secretary's statement for two and one-half years. *Larkin v. United States Dept. of Labor*, No. 78 C 2362 (Jan. 22, 1979 N.D.Ill.). Because of the Court's disposition of the merits of this action, it does not express an opinion on the question of timeliness.

der the Administrative Procedure Act.[12] *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). The Court defined the permissible scope of review in the following manner:

> Except in what must be the rare case, the court's review should be confined to examination of the "reasons" statement, and the determination whether the statement, without more, evinces that the Secretary's decision is so irrational as to constitute the decision arbitrary and capricious. Thus, review may not extend to cognizance or trial of a complaining member's challenges to the factual bases for the Secretary's conclusion either that no violations occurred or that they did not affect the outcome of the election. The full trappings of adversary trial-type hearings would be defiant of congressional objectives not to permit individuals to block or delay resolution of post-election disputes, but rather "to settle as quickly as practicable the cloud on the incumbents' titles to office"; and "to protect unions from frivolous litigation and unnecessary interference with their elections."

*Id.* at 572–73, 95 S.Ct. at 1860.

The Supreme Court in *Bachowski* proceeded to identify some of the "rare cases" that might justify review beyond the confines of the reasons statement. It stated that such review would be proper "if the Secretary were to declare that he no longer would enforce Title IV, or otherwise completely abrogate his enforcement responsibilities . . . [or] if the Secretary prosecuted complaints in a constitutionally discriminatory manner." *Id.* at 574, 95 S.Ct. at 1861. Other such cases might arise when the Secretary's decision was "plainly beyond the bounds of the Act [or] clearly defiant of the Act." *Id.* (quoting *DeVito v. Shultz*, 72 L.R.R.M. 2682, 2682 (D.D.C. 1969)).

No court subsequent to *Bachowski* has held that the Secretary's decision not to sue was "plainly beyond the bounds of the Act [or] clearly defiant of the Act." Plaintiffs here argue that the Secretary's alleged failure to make a full, reasonable, and proper investigation of the election is an appropriate subject for expanded judicial review. The Court concludes, however, that the present facts do not represent one of the "rare cases" contemplated by the Supreme Court in *Bachowski*. Consequently, the Court limits its review to the statement of reasons provided in support of the Secretary's decision not to sue.

█ When a district court determines that the statement of reasons adequately demonstrates that the Secretary's decision not to sue is not contrary to law, the complaining union member's suit fails and should be dismissed. *See Howard v. Hodgson*, 490 F.2d 1194, 1196 (8th Cir. 1974). If, however, the reviewing court finds that the statement of reasons is "so irrational as to constitute the decision arbitrary and capricious," it must remand the decision to the Secretary for a supplemental statement of reasons. 421 U.S. at 574–75, 95 S.Ct. at 1862. The Supreme Court in *Bachowski* expressly reserved the question whether a court can compel the Secretary to bring suit to overturn an election, the relief sought here, if the supplemental statement of reasons remains unsatisfactory. *Id.* It intimated, however, that this course might present "some difficulty in light of the strong evidence that Congress deliberately gave exclusive enforcement authority to the Secretary." *Id.* (footnote omitted).

The argument for narrow judicial review is supported by the problems posed by a district court attempting to compel the Secretary to bring suit. Such judicial coercion would conflict with the statutory scheme of the LMRDA, in which Congress relied on the "special knowledge and discretion" of the Secretary in making decisions to bring Title IV actions. *Calhoon v. Harvey*, 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). Compelling such a suit would raise questions regarding the principles of separation of powers, for the Constitution has vested the power to execute laws with the

---

12. *See* 5 U.S.C. §§ 701 *et seq.* (1976).

Executive Branch, not with the federal judiciary. Finally, it would be imprudent for courts to force the Secretary to sue when he is genuinely unwilling to do so because in such situations it is unlikely that the Secretary would pursue the lawsuit vigorously or effectively.[13]

■ Review of the statement of reasons is governed by the "arbitrary and capricious standard." 421 U.S. at 575, 95 S.Ct. 1851. In this case the eighty-three page statement of reasons demonstrates that each of plaintiffs' allegations was carefully investigated as were other possible violations not raised by plaintiffs. The investigative findings were considered and weighed in reaching the conclusion that the violations that had occurred could not have affected the election's outcome.

■ Such a decision was within the Secretary's statutory discretion, for the Secretary of Labor does not have an obligation to bring suit to set aside the results of an election whenever he finds a violation of the LMRDA and may refrain from bringing suit if he does not find probable cause to believe that the violation may have affected the outcome of the election. *Howard v. Hodgson,* 490 F.2d 1194, 1196 (8th Cir. 1974). This concept is embodied in the DOL regulations [14] and was recognized by the Supreme Court in *Bachowski* :

> [A]s a matter of law . . . the Secretary is not required to sue to set aside the election whenever the proofs before him suggest the suit might be successful. There remains in him a degree of discretion to select cases and it is his subjective judgment as to the probable outcome of the litigation that must control.

421 U.S. at 572, 95 S.Ct. at 1860 (quoting *DeVito v. Shultz,* 72 L.R.R.M. 2682, 2683 (D.D.C.1969)).

Only one reviewing court has found the Secretary's statement of reasons "so irrational as to be arbitrary and capricious" and this was the district court in *Bachowski,* in its decision on remand from the Supreme Court and the Third Circuit. *Bachowski v. Brennan,* 413 F.Supp. 147, 149 (W.D.Pa.), *appeal dismissed,* 545 F.2d 363 (3d Cir. 1976). In calculating the effect of violations on the outcome of the election, the Secretary distinguished between cases in which the number of votes affected could be determined with certainty and those in which it could not. In the former situation the Secretary credited the challenger Bachowski with the whole vote in the voting unit, but in the latter, he eliminated the winner's margin of victory and treated the result as if both candidates had obtained an equal number of votes and the election had never taken place. *Id.* at 149–150. In so doing the Secretary noted that "substantive violations of a type which may affect how a voter votes are to be distinguished from merely technical violations of a procedural character." *Id.* at 150.

The United States District Court for the Western District of Pennsylvania held that it was "contrary to the intent of Congress, and . . . irrational" to classify as technical those violations affecting the secrecy of a ballot. *Id.* It concluded that the mere fact that the number of voters who failed to vote can be readily counted when no election was held is not rational justification for using the total electorate in that case but using the margin of victory when the right of secrecy has been infringed. *Id.* at 151. The Court ordered the Secretary to conduct a "recount," applying "equal protection" principles. *Id.*

An appeal of this decision to the Third Circuit was dismissed for want of a final order. *Bachowski v. Usery,* 545 F.2d 363

---

13. *See* Note, *Dunlop v. Bachowski and the Limits of Judicial Review Under Title IV of the LMRDA: A Proposal for Administrative Reform,* 86 Yale L.J. 885, 900–03 (1977).

14. 29 C.F.R. § 452.16(b) (1978) states:
   Violations of the election provisions of the Act which occurred in the conduct of elections held within the prescribed time are not

grounds for setting aside an election unless they "may have affected the outcome." The Secretary, therefore, will not institute court proceedings upon the basis of a complaint alleging such violations unless he finds probable cause to believe that they "may have affected the outcome of an election."

(3d Cir. 1976). The decision has been described as "exceptional" and as "resting on narrow and questionable legal grounds." [15] It appears to this Court that the review undertaken was contrary to the Supreme Court's admonition in *Bachowski*, for despite the Secretary's reasonable explanation of his method of computation, the Court substituted its own judgment for that of the Secretary. Thus, this Court refuses to hold that the Secretary's use of a similar method of computation in this case renders the Secretary's decision not to sue arbitrary and capricious.

An additional ground for relief alleged by plaintiffs in their complaint is that the Secretary failed to carry out his duty as lawyer for the complaining union member. Plaintiffs allege that the defendant did not meet with plaintiffs' counsel and that his representatives did not advise plaintiffs regarding the progress of the investigation or consult with them concerning its conduct.

 The concept of the Secretary as the "union member's lawyer" derives from statements made by Senator John Kennedy during floor debates on the bill which was the precursor of Title IV of the LMRDA [16] and has been quoted by the Supreme Court in two decisions.[17] These two opinions define the scope of the Secretary's duty. In conducting an investigation and in deciding whether probable cause exists to institute suit, the Secretary is to serve the public interest and not the interests of any private party. Only after the Secretary has instituted suit does he assume a partisan role and become an advocate for the complaining union member. *See Trbovich v. United Mine Workers*, 404 U.S. 528, 539, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). This stage was never reached in this case. As a result, plaintiffs cannot seek judicial relief based on the Secretary's alleged violation of a nonexistent duty.

**15.** Note, *supra* note 13, at 899 n.55.

**16.** 104 Cong.Rec. 10947 (1958).

## CONCLUSION

Plaintiffs oppose defendant's and defendant-intervenor's motions for summary judgment on the ground that there are material issues of fact that preclude such a resolution. After consideration of the applicable legal precedents, however, this Court concludes that its judicial review is limited to the statement of reasons provided by the Secretary in support of his decision not to bring suit. A review of this eighty-three page document and the entire record in this case satisfies the Court that the Secretary's decision was not arbitrary and capricious and was within the bounds of his statutory discretion. For the reasons discussed above, the Court grants the motions for summary judgment filed by defendant and defendant-intervenor.

**17.** *Dunlop v. Bachowski*, 421 U.S. at 470, 95 S.Ct. 1851; *Trbovich v. United Mine Workers*, 404 U.S. 528, 539, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).